

## COURT OF APPEALS
## EIGHTH DISTRICT OF TEXAS
## EL PASO, TEXAS

| | | |
|---|---|---|
| RICARDO MARQUEZ, | § | No. 08-22-00177-CR |
| Appellant, | § | Appeal from the |
| v. | § | 409th Judicial District Court |
| THE STATE OF TEXAS, | § | of El Paso County, Texas |
| Appellee. | § | (TC No. 20220D01247) |

### SUBSTITUTE OPINION[1]

This case involves the murder of Erika Gaytan with no eyewitness, no confession, no body recovered, and no murder weapon found. On appeal, Ricardo Marquez challenges the legal sufficiency of the evidence supporting his conviction, contends the trial court erred in overruling a for-cause juror challenge, and challenges the legal and factual sufficiency of the negative finding on his sudden-passion claim. For the following reasons, we affirm.

## I. FACTUAL AND PROCEDURAL BACKGROUND

### A. Factual background

The jury trial in this matter spanned over ten days during the course of approximately a month in May and June 2022. Between the parties, more than 30 witnesses and 400 exhibits—

---

[1] Marquez's motion for rehearing is denied. However, we withdraw our opinion dated February 29, 2024, and issue this opinion in its place.

including two recorded statements Marquez gave to law enforcement—were admitted. After carefully reviewing the record, we provide the following as a summation of the evidence presented at trial.

### (1) Marquez and Gaytan's involvement

According to Marquez, a mutual friend introduced him to Gaytan after he saw her on Facebook, and the two had been casually dating for approximately a month. On July 12, 2019, they went out to a few bars together. One of Gaytan's friends who was at a bar with them that night testified that Marquez kept a close eye on Gaytan and "was just looking to see what [Gaytan] would look at." Marquez told police that he got into a fight with another man because the man was staring at Gaytan and told Marquez he was going to "twerk on her." Marquez and the other man were eventually separated, and the other man was kicked out of the bar. Gaytan's friend testified that after the fight, Gaytan held her hand for the rest of the night while at the bar. Gaytan's friend stayed at the bar because she did not want to leave Gaytan alone. Gaytan and Marquez left together that evening.

Marquez and Gaytan attended a concert together at the El Paso County Coliseum on the night of July 13, 2019. Most of what the jury heard about that night came from Marquez's recorded interviews with law enforcement. He stated that he picked Gaytan up in his Crown Victoria between 8:00 and 9:00 p.m. on July 13, and they arrived at the concert around 9:00 p.m. While at the concert, they got into what Marquez described as a "silly" argument over a comment he made about Gaytan's dress. They left the concert around 1:00 a.m. on July 14 with plans to go to a party at Gaytan's friend's house. However, according to Marquez, Gaytan changed her mind and wanted to go to a bar instead. When Marquez started driving toward the bar, Gaytan changed her mind again and wanted to go to her friend's house. So Marquez changed the direction he was driving

2

again. Marquez told law enforcement that he and Gaytan started to argue in the car because she kept changing their plans. Eventually he said "enough" and drove to his house.

Marquez said he had another argument with Gaytan on the drive to his house. He explained, "it had already been several times that I had insisted that, well, we be boyfriend and girlfriend or something" and he asked her why she had not yet given him a "yes." According to Marquez, Gaytan told him "[w]ell, it's that we're not anything[,]" and accused Marquez of talking to other women. Marquez said he continued to insist that she agree to be his girlfriend and told her he wanted something serious with her. Now at Marquez's house, Gaytan responded, "I no longer feel comfortable. I want to leave already." Marquez said he then followed Gaytan as she walked out of his house. He claimed that he offered to take her home, but she refused and said she was going to call a Lyft or go to an aunt's house close by. The following is Marquez's account of what happened next:

> "Look," I said to her, "Let me take you to your aunt's house." "No, no, no. I'm going to go by myself." At that point she leaves the house and I told her, "I will take you." "No. No. I already told you that I'm going to go by myself." . . . Then I told her, "You know what," I told her, "Come inside and call for it." I told her, "Call for it there inside if [] you are going to call for it." I tell her, "The neighbors are very gossipy." I told her, "They are going to call the police or something." . . . At that point she says, "No. No. No. You go inside. I'm going to wait for it here." . . . I told her, "Come inside." I told her, "You can ask for it here." I told her, "You see, you're clinging to . . . you not wanting me to take you. Call for it here." "No, I don't feel comfortable with you anymore." . . . I told her, "Do what you want." At that point I turn around and I go inside the house. . . . I had taken the dogs [] because they were barking because [] they don't know her, they start to bark. . . . So I let them out. When I got there, I closed the door. I put the dogs inside and I go to lie down . . . . I never checked if they got there for her. That was my mistake. I go to lie down and I got the urge to--well, I was still in party mode. And I said to myself, "I am going to call--I'm going to go to my brother's." So I drove []--to my brother's. And when I'm about to get there, I called him. Well, he didn't answer me so I said to myself, "No, well, nothing to do about it," and I came back. I came back to my house. I fell asleep.

### (2) Gaytan's disappearance

Erika Gaytan was described by witnesses as the loving and dedicated mother of a young son who would follow through on her plans with him; a family member and friend to many and someone who was responsive to their texts and calls; and someone with a robust and consistent social media presence. She had communicated on Facebook that she was excited about a new job and was going back to school. Her belongings, her son's belongings, and her dog were all at her apartment. Witnesses testified that it would be uncharacteristic of her to leave her life behind. Yet, Gaytan went radio-silent in the early morning of July 14, 2019, and was never heard from or seen again. At trial, Marquez suggested she had motives to disappear; however, on appeal, Marquez concedes that the evidence presented at trial could have led a jury to conclude Gaytan is dead.

### (3) Marquez's conduct after Gaytan's disappearance

#### (a) July 14, 2019

According to Marquez, he woke up around 11:00 or 11:30 a.m. on July 14, 2019, and sent Gaytan a text message. He did not question why Gaytan never responded to him because she had told him she was going to Juarez, and he assumed she either did not have signal or was still angry with him. He told law enforcement that he thought to himself, "Well, for her to be mad one day, well, I'm going to leave her alone, right? I'm also not going to be insisting." There is no evidence in Marquez's cell phone records that he ever tried to call Gaytan after July 13.

Law enforcement reviewed Marquez's phone messages and learned that at 10:55 a.m. the morning after the concert, Marquez sent a message to his brother, Roberto Marquez (Roberto), asking if he could borrow his Jeep. Roberto testified at trial that Marquez told him he needed to borrow his Jeep for about two hours because he was going on a date and the air conditioner in his car was not working. Marquez told law enforcement after his arrest that he used the Jeep to go see

4

someone at her house but could not remember where she lived, other than it was by Montana about five minutes from his house. Marquez refused to give law enforcement her name. Roberto stated that Marquez picked up the Jeep from his home around 11:00 a.m. To Roberto's knowledge, he had never met Gaytan and she had never been in his Jeep.

At 11:00 a.m.—five minutes after the message to his brother—Marquez sent a message to his brother-in-law asking if he could borrow his shovel. His brother-in-law responded that he was at work and told Marquez to call his sister. Marquez's call records show that he called his sister at 11:15 a.m. and spoke to her for 45 seconds. Marquez later said that he borrowed his sister's shovel that morning because he wanted to clean the front yard, but that he never cleaned the yard because "the occasion didn't present itself." Law enforcement found the shovel outside his house during a search on July 19, 2019, pursuant to a search warrant.[2]

After discovering that Marquez had borrowed Roberto's Jeep, law enforcement started pulling surveillance videos from the area around Marquez's and Roberto's residences to track the movement of Marquez's Crown Victoria and Roberto's Jeep from approximately 11:00 a.m. to approximately 3:00 p.m. on July 14. The first video shown at trial was from an elementary school between Marquez's residence and his sister's house. It shows Marquez's Crown Victoria going in the direction of his sister's house on July 14 and ten minutes later returning in the direction of Marquez's residence. A video from near Roberto's house shows the Jeep leaving Roberto's house shortly after 11:30 a.m. and being returned approximately two-and-a-half hours later. And a video

---

[2] And in his Crown Victoria, they found a bottle of liquor, a large gasoline can, knives, a pair of gloves, a ski mask, and zip-ties in figure-eight or handcuff shapes. With regard to the items found in his vehicle, Marquez stated, "So right now I know that all that looks bad right now in this situation." Marquez explained that he used zip ties for work and made them into figure-eight shapes "just because." Marquez's co-worker testified that zip ties were commonly used by electricians but were not common in the line of work he and Marquez did on a daily basis. He also testified that there is no reason for zip ties to be fashioned into handcuffs at a construction site. With regard to the gas can, it did not have any fuel in it, but according to testimony from an investigating law enforcement officer, it smelled like gas inside.

from a business between Roberto's home and Marquez's shows the Jeep going towards Marquez's residence shortly before noon on July 14. Videos from several businesses along Montana Avenue then establish that the Jeep was heading eastbound toward the Red Sands recreation area. The last surveillance camera catching the Jeep traveling eastbound toward Red Sands on Montana Avenue was at Red Barn Trailers at 12:40 p.m. It is then seen returning from the direction of Red Sands past Red Barn Trailers just before 1:40 p.m. An investigator testified to law enforcement's theory: that Marquez used Roberto's Jeep and his brother-in-law's shovel to transport Gaytan's body to the Red Sands area to dispose of it.

Roberto testified that Marquez returned to his house with the Jeep at approximately 2:23 p.m. Roberto, Marquez, and Roberto's two children then went to Red Sands to offroad in the Jeep. While at Red Sands, they opened the cargo area of the Jeep where Roberto had his children's toys, backpacks, and an ice chest. Marquez sent a text message to his mother at 3:17 p.m. to let her know he moved her car out of the garage because he parked his inside.

### (b) Marquez's interaction with law enforcement

On July 19, 2019, an El Paso Police Department (EPPD) detective called Marquez, but he did not answer. Two detectives then went to his residence to attempt to speak with him in person. A Crown Victoria and a Dodge Caliber were parked in the driveway. No one answered the door. They attempted to call Marquez two more times, but he did not answer.

Two detectives watched the house for approximately ten hours without detecting any activity. At around 4:00 a.m., however, they saw lights come on inside the house. Minutes later, a woman emerged from the house and left in the Dodge Caliber. The woman was later identified as Maria Marquez (Maria), Marquez's mother. Maria drove "around and around" in circles before she was pulled over by the EPPD detectives about a block away from Marquez's home. Marquez's

6

phone records show that at 4:46 a.m., she called him while she was being followed. Marquez answered the call and they spoke for 35 seconds. After the stop, the detectives explained to Maria that they had a search warrant for her residence, to which she responded, "I know what this is about." Maria then told the detectives Marquez was at the house and, after leading them back, opened the front door and called Marquez downstairs. At that point, Marquez agreed to give a statement at the police department.

In his first statement to law enforcement after Gaytan's disappearance, Marquez stated that he had insisted to Gaytan several times that "we be boyfriend and girlfriend or something." Gaytan, however, had rejected him. In his second statement, which took place approximately five months after his first statement and after he had been arrested for Gaytan's murder, Marquez told law enforcement that he did not remember exactly what happened the night of Gaytan's disappearance because he was drunk at the time. He did, however, tell law enforcement during his second interview that he was never interested in having a relationship with Gaytan, and "wouldn't have stayed in a serious relationship" with her because of her "past." He described Gaytan as not being "suitable for a serious relationship" and said he was only dating her to have some fun. Detective Gerardo Rodrigues testified that he found it unusual that Marquez spoke of Gaytan in the past-tense at times during the first interview.

**(4) Marquez's statements after Gaytan's disappearance**

Marquez talked to several people (in addition to law enforcement) about Gaytan's disappearance. Some of them testified at trial. For example, Anabel Diaz—a mutual friend of Gaytan and Marquez—testified that she called Marquez the day after the concert to ask if he knew where Gaytan was. During the conversation, Diaz told Marquez "well, she doesn't show up and the last person she was with was you." Marquez responded, "[y]eah, I know and that's what

7

worries me because the way you are accusing me people are going to think the same thing." He also told Diaz that he was "doubly worried," because "[f]irst, [] well, I care about [Gaytan] and second, because, well, the last person she was with was me." According to Diaz, however, Marquez refused to speak with Gaytan's family and she did not "see [an] interest, a big interest on him trying to give information [of] where [Gaytan] was or what happened" and she felt "he was worried about himself."

Diaz also testified that Marquez's story was inconsistent. When she first asked him about Gaytan, Marquez told her that after the concert, he and Gaytan went to Ochoa's house and then to his house. But later, he said they did not go to Ochoa's house. Marquez was also inconsistent about how Gaytan left his house, in terms of walking or in a rideshare. He initially told Diaz that once they were at his house, his ex-girlfriend messaged him, which upset Gaytan and caused an argument between him and Gaytan. Then, Gaytan "stormed out from his house walking." Marquez also told Gaytan's cousin that he and Gaytan had an argument but said she left his house in an Uber; later, he told Ruiz he did not know if Gayan left his house on foot or by Uber.

Marquez's ex-girlfriend, Ana Quezada, also testified about a conversation she had with him at a bar approximately a month after Gaytan's disappearance. She testified that in response to her asking him if he had killed Gaytan, Marquez stated "[t]he police thinks I burned her. That is why they can't find her." When asked how she interpreted Marquez's response, Quezada testified, "[w]ell, I mean, he didn't say yes. He didn't say no. And in a certain way I thought that maybe he did do it. I don't know."

Daniel Serrano, Marquez's co-worker, also testified at trial about a statement Marquez made to him. Serrano stated that he gave Marquez a ride to work a few times, and on one occasion

8

in response to Serrano's teasing, asking where Marquez left Gaytan, Marquez told him "they are never going to find her."

### (5) Evidence regarding cell phone locations

FBI Special Agent Sean Macmanus, a member of the Cellular Analysis Survey Team with specialized training in radio frequency, cell phones, cell phone networks, and the analysis of records relating to phone location, provided expert testimony in the field of mobile device location analysis. He testified at trial regarding Marquez's and Gaytan's cell phone records and Google location history on July 13 and 14, 2019. Agent Macmanus testified that Marquez called Gaytan at 8:34 p.m. on the evening of the concert from near his home. This phone call is the last recorded phone call activity for Gaytan's phone. At 8:58 p.m., Google records show Marquez was near Gaytan's residence. And by 9:07 p.m., the records show Marquez and Gaytan traveling together on Loop 375.[3] They arrived at the Coliseum by 9:25 p.m. Marquez and Gaytan departed from the Coliseum by 1:09 a.m. and traveled southeast and then northeast on Loop 375 until 1:19 a.m. At 1:25 a.m., Gaytan's Google records show she searched a Fitzpatrick Way address on Google maps, which was Hilda Moreno's address. Marquez and Gaytan then turned onto I-10 in the direction of Hilda Moreno's house, then changed course and headed southeast again. From 1:25 a.m. to 1:30 a.m., however, "very little movement" was reported, which caught the detectives' attention because Marquez and Gaytan were traveling on I-10 during this period.

The records then show that by 1:30 a.m., they were traveling toward Marquez's residence and arrived there about 1:40 a.m. From 1:41 a.m. to around 2:20 a.m., Gaytan's record activity shows over a dozen Google pins, all reflecting the vicinity of Marquez's residence. After 2:19 a.m., Gaytan's Google activity stopped. According to Agent Macmanus, Gaytan's phone was turned off

---

[3] By traveling "together" we mean that Google location detected Marquez's and Gaytan's phones in the same location.

at this point and never turned back on. The last recorded location of Gaytan's phone, based on the Google records, was in the immediate vicinity of Marquez's home.

As for Marquez's phone, Agent Macmanus testified that from 1:26 a.m. to 3:10 a.m., there was one phone call and several Google activities recorded also reflecting the vicinity of Marquez's residence. Marquez had Google activities from 1:43 a.m. to 1:59 a.m., another one at 2:54 a.m., and others from 3:07 a.m. to 3:10 a.m. As for the phone call, it was an outgoing call made by Marquez at 3:08 a.m. to Roberto, which was made from the vicinity of Marquez's house. After 3:10 a.m., and for days thereafter, there are no Google location activity records for Marquez's device. It wasn't until the afternoon of July 19 that the location history records showed up again. When asked whether it is unusual for Google to stop collecting information for that length of time, Agent Macmanus responded that in his opinion Marquez adjusted his phone to remove location services:

> Yes. Typically, Google tries to consistently record your information. You will sometimes see gaps for short periods of time, but normally when there is no--there is Google location and then no Google location, somebody's done something to their phone, either changed the settings, deleted an app or turned off the location history. Additionally, a user can go in and log in and delete their location history if they choose to.

### (6) Forensic evidence

Law enforcement searched Roberto's Jeep on July 30, 2019, over two weeks after Gaytan's disappearance. When law enforcement first identified the Jeep at Roberto's residence, but before they had a search warrant, the Jeep did not appear to have been washed. When they returned the same day with the search warrant, however, the Jeep had been cleaned. Roberto testified that he knew law enforcement would take custody of his Jeep because his brother was a person of interest on the news and had borrowed his Jeep "that day in question." He testified that he cleaned the Jeep despite this knowledge.

10

A trace amount of DNA belonging to Gaytan was detected on the left center area of the rear cargo compartment cover of the Jeep. The DNA profile, more specifically, was interpreted as a mixture of three individuals—Gaytan, Marquez, and Roberto's minor son. Approximately 53% of the DNA profile was attributed to Gaytan.

Marquez tried to discredit the DNA testing in this case by pointing out that the Texas Department of Public Safety Crime Lab in El Paso where the DNA analysis for this case took place had experienced several contamination events. Specifically, he questioned Texas DPS employee Cathey Serrano—who conducted the DNA analysis in this case—regarding the contamination events. Serrano testified that between September 2019 and May 2022, there were 20 contamination events at the lab. And she testified that she experienced ten contamination events in the 544 cases she was involved in during that time period. Serrano testified, however, that the contamination events were all unrelated to this case. Further, she stated that there are several methods for detecting contamination, that she employed those methods in this case, and that there was no evidence of a contamination event in this case.

Marquez also presented testimony from Dr. Michael J. Spence, an expert in biology and DNA forensics. Dr. Spence confirmed that trace DNA belonging to Gaytan was detected on the Jeep compartment cover and discussed the possibility of a secondary transfer. He claimed that her DNA could have been transferred to the Jeep "from a lot of mechanisms." He explained, for example, that it was possible Marquez could have transferred Gaytan's DNA to the Jeep as a result of not washing his hands after he was with Gaytan, or that he could have transferred Gaytan's DNA as a result of sharing the liquor bottle with Gaytan—i.e., Gaytan's DNA being transferred onto Marquez's hands from the mouth of the liquor bottle they shared—or that her DNA could have come from a door handle. Dr. Spence also testified about the possibility that "the presence of

[Gaytan's] DNA profile in the tested swab was a result of a lab contamination error" at any stage of collecting evidence. However, Dr. Spence explained that these were "hypothetical" possibilities because "[t]here is no way of diagnosing how DNA arrives on a given surface." He agreed that Gaytan's DNA could also have ended up in Roberto's Jeep by "criminal activity . . . primary transfer or direct contact" between Gaytan and the Jeep.

## B. Procedural background

On February 4, 2020, an El Paso County grand jury indicted Marquez with one count of murder and one count of tampering with evidence under cause number 20200D00301. It later re-indicted him under a new cause number (20220D01247) with one count of murder and one count of aggravated kidnapping. Tex. Penal Code. Ann. §§ 19.02(c), 20.04(a)(5). The trial court granted a motion to carry over all filings and proceedings of the parties from the original indictment to the second indictment. Consequently, all proceedings relevant to this appeal arise from cause number 20220D01247.

Marquez pled not guilty to both counts and proceeded to a jury trial that began on May 27, 2022. At the end of the State's case in chief, Marquez moved for a directed verdict on both counts. The trial court granted the directed verdict as to Count II (aggravated kidnapping) and denied it as to Count I (murder). The jury then found Marquez guilty of murder.

At the punishment phase of trial, and without proffering any additional evidence other than his aunt's testimony that he was a good person, Marquez raised a sudden-passion claim based solely on the State's theory of how Marquez killed Gaytan, i.e., that Marquez "snapped" in a fit of rage in response to Gaytan's final rejection of him. Following the presentation of evidence at the

12

punishment phase,[4] the trial court rejected Marquez's sudden-passion claim and found the habitualization enhancement paragraph not true. It then sentenced him to 75 years' confinement in the Texas Department of Criminal Justice Institutional Division. Marquez filed a motion for new trial, which was denied by operation of law. This appeal followed.

## II. DISCUSSION

In three issues, Marquez challenges his murder conviction. In Issue One, Marquez maintains the evidence is legally insufficient to support his conviction. In Issue Two, Marquez asserts the trial court erred when it overruled his for-cause challenge to a particular juror. In Issue Three, Marquez challenges the trial court's rejection of his sudden-passion claim on legal and factual sufficiency grounds. We discuss each issue in turn.

### A. Sufficiency of the evidence

In his first issue, while Marquez concedes that the evidence presented at trial could have led a jury to conclude Gaytan is deceased, Marquez contends the State failed to meet its burden of establishing the elements necessary for a murder conviction. More specifically, he argues, the State produced no evidence that he committed any act that caused Gaytan's death and no facts exist in the record "concerning [his] conduct from which the jury could have reasonably inferred that he possessed the requisite mental state to support a conviction for murder." For the following reasons, we disagree.

### (1) Standard of review

Under the Due Process Clause of the U.S. Constitution, the State is required to prove every element of the charged offense beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307,

---

[4] In his appellate briefing on the sudden-passion claim, Marquez also mentions some of the State's punishment-phase evidence. Namely, the State called three witnesses "for no other reason than to establish that [he] was a jealous, angry person generally."

13

318–19 (1979). In reviewing the sufficiency of the evidence where the State has the burden of proof beyond a reasonable doubt, we apply the legal sufficiency standard as articulated in *Jackson*. *Brooks v. State*, 323 S.W.3d 893, 894–95 (Tex. Crim. App. 2010); *Rogers v. State*, No. 08-22-00207-CR, 2023 WL 3736730, at *3 (Tex. App.—El Paso May 31, 2023, no pet.) (mem. op., not designated for publication). We must view all the evidence in the light most favorable to the verdict to determine whether any rational juror could have found the essential elements of the offense beyond a reasonable doubt. *Salinas v. State*, 163 S.W.3d 734, 737 (Tex. Crim. App. 2005).

The trier of fact is the sole judge of the weight and credibility of the evidence. *Isassi v. State*, 330 S.W.3d 633, 638 (Tex. Crim. App. 2010). As such, we may not reevaluate the weight or credibility of the evidence or substitute our judgment for that of the fact-finder. *Id.* We must presume the fact-finder resolved any conflicting inferences in favor of the verdict, and we defer to those determinations. *Id.* "For the evidence to be sufficient, the State need not disprove all reasonable alternative hypotheses that are inconsistent with the defendant's guilt." *Wise v. State*, 364 S.W.3d 900, 903 (Tex. Crim. App. 2012). Rather, a court considers only whether the inferences necessary to establish guilt are reasonable based upon the cumulative force of all the evidence when considered in the light most favorable to the verdict. *Id.* "This standard gives full play to the responsibility of the factfinder to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Nisbett v. State*, 552 S.W.3d 244, 262 (Tex. Crim. App. 2018) (quoting *Jackson*, 443 U.S. at 319).

In making this determination, we keep in mind that "[d]irect and circumstantial evidence are treated equally: Circumstantial evidence is as probative as direct evidence in establishing the guilt of an actor, and circumstantial evidence alone can be sufficient to establish guilt." *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007) (quoting *Hooper v. State*, 214 S.W.3d 9, 13

14

(Tex. Crim. App. 2007)). Further, "[e]ach fact need not point directly and independently to guilt if the cumulative force of all incriminating circumstances is sufficient to support the conviction." *Nisbett*, 552 S.W.3d at 262. "Because evidence must be considered cumulatively, appellate courts are not permitted to use a divide and conquer strategy for evaluating the sufficiency of the evidence." *Id*.

### (2) Applicable law

Marquez was charged with murder under Tex. Penal Code Ann. § 19.02(b). As charged in the indictment, the State was required to prove, beyond a reasonable doubt, that Marquez either: (1)(a) intentionally or knowingly, (1)(b) caused the death of Gaytan by manner and means unknown; or (2)(a) with intent to cause serious bodily injury, (2)(b) committed an act clearly dangerous to human life that caused the death of Gaytan, by manner and means unknown. Tex. Penal Code. Ann. § 19.02(b). In general, to establish that a defendant committed an offense, the State must establish an "actus reus," i.e., that the defendant voluntarily committed a criminal act, and a "mens rea," i.e., that the defendant had the mental state required for the particular offense with which he is charged. *Ramirez-Memije v. State*, 444 S.W.3d 624, 627 (Tex. Crim. App. 2014); *see also Apilado v. State*, No. 08-16-00358-CR, 2018 WL 3629371, at *4 (Tex. App.—El Paso July 31, 2018, pet. ref'd) (not designated for publication) (recognizing the "rudimentary concept that criminal liability must be supported by proof of both *mens rea* (a culpable mental state) and *actus reus* (a criminal act)").

Recognizing the difficulty in establishing guilt in a case such as this where neither the victim's body nor a murder weapon has been found, the Texas Court of Criminal Appeals in *Nisbett* addressed the appropriate analysis courts should utilize in considering whether there is sufficient evidence to support the elements of murder. *Nisbett*, 552 S.W.3d at 246.

*Nisbett* was a consolidated appeal of two unrelated murder convictions involving similar fact patterns in which two defendants were convicted of murdering their wives, where neither the wives' bodies nor murder weapons were ever found. In the appeal brought by Rex Nisbett, the court of appeals reversed Nisbett's conviction because the State "did not establish what the fatal act was" or how the defendant allegedly caused his wife's death. *Nisbett v. State*, No. 03-14-00402-CR, 2016 WL 7335843, at *10 (Tex. App.—Austin Dec. 15, 2016, pet. granted) (mem. op., not designated for publication). Conversely, in the appeal brought by George Delacruz, the court of appeals rejected Delacruz's argument that the evidence was insufficient to convict him for his wife's murder because the State did not establish that he had "committed a criminal act" that caused her death. *Delacruz v. State*, No. 03-15-00302-CR, 2017 WL 1487391, at *25 (Tex. App.—Austin April 21, 2017, pet. granted) (mem. op., not designated for publication). In affirming Delacruz's conviction, the court of appeals held that "the State was not required to prove *how* Delacruz caused [the victim's] death, only that he did." *Id.* at *26.

The Texas Court of Criminal Appeals agreed with the court of appeals in *Delacruz*, holding that while "[e]vidence of how a victim died would likely be helpful in proving that the victim is dead (as well proving other elements of murder)," "it need not necessarily be known what caused the victim's death." *Nisbett*, 552 S.W.3d at 264. This is because "murder is a result-of-conduct crime," and therefore "[w]hat caused the victim's death is not the focus or gravamen of the offense; the focus or gravamen of the offense is that the victim was killed." *Johnson v. State*, 364 S.W.3d 292, 298 (Tex. Crim. App. 2012) (citing *Young v. State*, 341 S.W.3d 417, 423 (Tex. Crim. App. 2011)). Therefore, as the court in *Nisbett* recognized, "[t]he cumulative force of all the incriminating circumstances can support a murder conviction 'even if the evidence did not prove the method of commission of the offense.'" *Nisbett*, 552 S.W.3d at 264 (quoting *Ramos v. State*,

407 S.W.3d 265, 271 (Tex. Crim. App. 2013)); *see also Sanchez v. State*, 376 S.W.3d 767, 773–74 (Tex. Crim. App. 2012) (recognizing that "[n]either the manner (the actus reus) nor the means (the 'instrument of death') need to be agreed upon unanimously by a jury"); *Stafford v. State*, 248 S.W.3d 400, 406 (Tex. App.—Beaumont 2008, pet. ref'd) (the manner and means by which a victim's death was caused are not essential elements of the offense of murder).

The court in *Nisbett* then broke its sufficiency analysis into three categories: (1) whether there was sufficient circumstantial evidence to establish that the victims had died; (2) whether there was sufficient evidence to link the defendants to the victims' disappearance (to satisfy the actus reus requirement); and (3) whether there was sufficient evidence to support its finding that the defendants had the requisite mental state to support a murder conviction (to satisfy the mens rea requirement). *Id.* at 263, 265, 267. Here, because Marquez has conceded there was sufficient evidence from which the jury could have inferred Gaytan was dead, we consider only the latter two categories.

### (3) Evidence linking Marquez to Gaytan's disappearance

Conceding that the State was not required to prove the manner and means by which Gaytan died—or in other words, how she died—Marquez nevertheless contends the evidence was insufficient to support his murder conviction, as the State failed to come forward with any evidence of a specific act he committed that led to Gaytan's death, i.e., the actus reus of the offense. As explained below, however, we find sufficient evidence in the record linking Marquez to Gaytan's disappearance, which would have allowed the jury to rationally infer he committed an act that caused her death.

In *Nisbett*, the court listed several factors that a jury may consider in linking a defendant to the victim's disappearance and ultimately to her death. First, the court recognized that motive and

opportunity, while not sufficient standing alone, are significant factors a jury may consider in establishing such a link. *Id.* at 265 (recognizing that "[o]pportunity, when coupled with motive, is not sufficient to prove identity in a murder prosecution but is indicative of guilt.") (citing *Temple v. State*, 390 S.W.3d 341, 360 (Tex. Crim. App. 2013)). In addition, among other things, the court noted the jury could consider evidence that the defendant and the victim were in a troubled relationship; evidence of the defendant's prior behavior toward the deceased; evidence that the defendant engaged in suspicious behavior after the victim's disappearance; evidence that the defendant provided inconsistent or false statements relating to the victim's disappearance; and "other circumstantial evidence, such as physical evidence or electronic evidence[.]" *Id* at 265–66. Utilizing these factors, the court in *Nisbett* found sufficient circumstantial evidence to link the two defendants to their wives' disappearance and ultimately to their deaths, despite the lack of evidence that they committed any specific acts that caused their wives' deaths. *Id.* at 263–67.

Similarly, we find sufficient evidence in the record linking Marquez to Gaytan's disappearance and ultimately to her death. First, the record contains evidence that Gaytan was last seen with Marquez on July 13, the night before her disappearance, giving Marquez the opportunity to commit the murder. Marquez himself acknowledged that he and Gaytan were on a date that night and into the early morning hours of July 14, and that he was the last person to see her alive before she disappeared that day. And the record reflects that the last recorded location of Gaytan's phone was at 2:19 a.m. the morning of Gaytan's disappearance, in the immediate vicinity of Marquez's home, after which her phone was turned off.

The record contains evidence that Marquez was jealous and possessive of Gaytan, and that he was angry she had rebuffed his efforts to enter into a serious relationship with him, giving him a motive to commit the murder. For example, there was testimony that shortly before Gaytan's

death, Marquez watched her carefully at a bar to see everything she was doing and got into a fight with another man because he believed the man had disrespected him by wanting to dance suggestively with Gaytan. Gaytan's friend testified that after the fight, Gaytan held onto her hand for the rest of the night while at the bar until Gaytan left with Marquez. In addition, Marquez told law enforcement that the night of her disappearance, he and Gaytan had had gotten into at least three arguments. The third one, according to Marquez, was due to Gaytan's multiple rejections of his insistence that the two be boyfriend and girlfriend, and her wanting only to be friends.

Despite Marquez's assertion that he was cooperative with law enforcement's investigation into Gaytan's disappearance, the record reflects that he did not speak to law enforcement officers until five days after her disappearance, and only did so after they informed his mother that they had a warrant to search her residence. When he did eventually speak with police, Marquez provided inconsistent and/or false statements, which the jury could have also considered as circumstantial evidence of his guilt. *See Guevara v. State*, 152 S.W.3d 45, 50 (Tex. Crim. App. 2004) (recognizing that a defendant's false or inconsistent statements may support an inference of guilt); *Padilla v. State*, 326 S.W.3d 195, 201 (Tex. Crim. App. 2010) (holding that a rational fact-finder can consider a defendant's untruthful statements as evidence of the defendant's guilt).

For example, Marquez provided inconsistent statements to police regarding the nature of his relationship with Gaytan and whether he wanted a serious relationship with her. Marquez further provided inconsistent or even false statements to police regarding what occurred after his date with Gaytan ended on the morning of her disappearance. Specifically, Marquez stated that Gaytan left his residence in the early morning hours of July 14 to either call a Lyft or to walk to her aunt's house. But warrants were obtained for Gaytan's Lyft and Uber records, which revealed that Gaytan did not order a ride through Lyft on July 14, 2019, and that she did not have an Uber

19

account. The last time Gaytan's aunt saw her was on July 13. Marquez also told police that after Gaytan left his house on July 14, he drove to his brother Roberto's house around 3:00 a.m. because he was still in "party mode," and that he tried to call his brother when he was close to his brother's house. Yet, Marquez's cell phone records establish that Marquez tried to call Roberto from the vicinity of Marquez's own home. And according to Roberto, it was not common for Marquez to come to his house at this time of night to drink, since Roberto had kids. The jury was entitled to consider these inconsistencies in determining Marquez's guilt.

The record also reflects that Marquez engaged in suspicious behavior immediately after Gaytan's disappearance, suggesting he was attempting to conceal or cover up evidence from law enforcement, which the jury was entitled to consider in determining Marquez's guilt. *See Guevara*, 152 S.W.3d at 50 (recognizing that attempts to conceal incriminating evidence are probative of wrongful conduct). For instance, Marquez's phone records show significant location activity on the night of Gaytan's disappearance. His location activity, however, ended at 3:10 a.m. on July 14, two minutes after Marquez called Roberto and less than an hour after the location services on Gaytan's phone also ended (showing it last at Marquez's house or in the immediate vicinity). As set forth above, the State presented testimony from an expert in the analysis of Google location and cell phone records, who expressed his opinion that Marquez adjusted his phone to remove the location services. And while Marquez argues on appeal that there was evidence that it was common for his phone to not share its location for days and even weeks at a time in the months before Gaytan's death, the jury was free to reject that explanation and to instead conclude that Marquez turned off his phone's location services (and perhaps Gaytan's as well) in an attempt to conceal his crime. *See Nisbett*, 552 S.W.3d at 262 (recognizing that the fact-finder is entitled "to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic

20

facts to ultimate facts."); *Dobbs v. State*, 434 S.W.3d 166, 170 (Tex. Crim. App. 2014) ("When the record supports conflicting inferences, we presume that the jury resolved the conflicts in favor of the verdict, and we defer to that determination.").

There was also significant evidence of Marquez's suspicious behavior on July 14, again suggesting he was attempting to conceal evidence of his crime. Just hours after Gaytan's disappearance, Marquez texted Roberto asking if he could borrow his Jeep. And five minutes later, he texted his brother-in-law asking to borrow a shovel. Security camera footage recorded Marquez driving to his brother-in-law's house and then returning to his residence. The Jeep was then seen driving towards the Red Sands desert area at 12:40 p.m. and returning approximately an hour later. Roberto testified that Marquez returned his Jeep to him at approximately 2:23 p.m., after which Marquez returned to the Red Sands area once again with Roberto and his sons.

Further, Marquez provided an implausible explanation for why he wanted to borrow Roberto's Jeep on the day of Gaytan's disappearance, claiming he was going on a date with another woman and the air conditioner in his car did not work. Yet, Marquez only made mention of visiting the woman at her home, he could not recall where exactly she lived, and he refused to provide law enforcement her name. The jury was also entitled to consider this implausible explanation for his suspicious behavior in determining Marquez's guilt. *See Guevara*, 152 S.W.3d at 50 (recognizing that a defendant's implausible explanation for his suspicious behavior is "probative of wrongful conduct" and can be considered by the jury as a "circumstance[] of guilt").

Finally, we find it significant that Gaytan's DNA, in a trace amount, was detected in the rear cargo compartment cover of Roberto's Jeep approximately two weeks after her disappearance, despite evidence that Gaytan had never met Roberto, had never been in his Jeep to Roberto's knowledge, and the Jeep had been washed in the interim. Marquez, however, argues, that Gaytan's

21

DNA could have ended up in the Jeep through indirect transfer, contending Gaytan's DNA could have been on his person following their date, and he could have carried her DNA to Roberto's Jeep the next day. Although both the defense and the State's expert witnesses testified at trial that this was a possibility, they both also testified that it was equally possible that Gaytan's DNA ended up in the Jeep by "primary transfer or direct contact" between Gaytan and the Jeep. And Marquez's own expert testified that Gaytan's DNA could have been found in the Jeep as the result of "criminal activity." As the ultimate trier of fact, the jury was free to accept the latter explanation and conclude that Gaytan's DNA in the Jeep was consistent with the State's theory that Marquez killed Gaytan and then placed her body in the Jeep to dispose of it.

We find these factors, viewed as a whole, clearly linked Marquez to Gaytan's disappearance and were sufficient to allow a jury to rationally infer that Marquez committed an act that led to her death.

### (4) Evidence of Marquez's mental state

For similar reasons, we conclude there was sufficient evidence from which the jury could have rationally inferred that Marquez had the requisite mental state, or mens rea, to support a finding that he committed murder. In *Nisbett*, the court recognized, as it has done in numerous cases, that a "culpable mental state must generally be inferred from the circumstances." *Nisbett*, 552 S.W.3d at 267 (citing *In re State ex rel. Weeks*, 391 S.W.3d 117, 125 n.36 (Tex. Crim. App. 2013); *Hernandez v. State*, 819 S.W.2d 806, 810 (Tex. Crim. App. 1991)). This is because neither the jury nor a court can "read an accused's mind," and therefore, absent a confession, a defendant's intent must be inferred from his "acts, words and conduct." *Id.* (citing *Hernandez*, 819 S.W.2d at 810).

In *Nisbett*, the court concluded that there was sufficient circumstantial evidence to infer that the defendants had the requisite intent to commit their wives' murders, relying on evidence of their motives; their suspicious conduct after their wives' disappearance suggesting they were attempting to conceal their crimes; and the "implausible explanations" for their suspicious conduct that they later provided to police. *Id*. at 267 (recognizing that the culpable mental state for murder can be inferred from a variety of factors, including the "defendant's motive, his attempts to conceal the body, and implausible explanations to the police"). Marquez attempts to distinguish his case from the facts in *Nisbett*, contending that in both of those cases, the State presented far more circumstantial evidence of the defendants' intent to murder their victims than the State did in his case. Marquez's attempt to distinguish his case fails for several reasons.

First, we find more similarities than dissimilarities in comparing Marquez's case to the *Nisbett* cases. As set forth above, Marquez, like both Nisbett and Delacruz, had a motive to kill his victim, as the evidence supported a finding that he and Gaytan were in a troubled (dating) relationship; Marquez was jealous and possessive of Gaytan; they had argued at least three times the night before Gaytan's disappearance; and Gaytan had rebuffed Marquez's insistence that they be a couple on multiple occasions, including the night of her death. *Id.* at 247, 253–54 (chronicling the troubled nature of the defendants' relationship with their wives).

In addition, as was the case with both defendants in *Nisbett*, the jury in Marquez's case heard evidence that he engaged in suspicious activity after Gaytan's disappearance, including turning off the location function on his phone; borrowing Roberto's Jeep and his brother-in-law's shovel, and then driving the Jeep—which was later found to have Gaytan's DNA in it—to the Red Sands desert area; and his initial avoidance of police after Gaytan's disappearance. And, like Delacruz, Marquez provided an implausible and unsubstantiated explanation for his suspicious

23

behavior in borrowing Roberto's Jeep. [5] *Id*. at 249–250, 255, 257–58 (chronicling the defendants' suspicious behavior and implausible explanations to law enforcement).

As the Texas Court of Criminal Appeals has repeatedly explained, when a defendant engages in suspicious conduct after a victim's death and then provides implausible explanations for his conduct, this constitutes "strong evidence of [the defendant's] consciousness of guilt[,]" which a jury may consider in determining whether the defendant had the requisite intent to murder his victim. *See Ex Parte Weinstein*, 421 S.W.3d 656, 668 (Tex. Crim. App. 2014) (recognizing that evidence of a defendant's conduct after a victim's death, such as attempting to conceal his crime and providing implausible explanations to police, reflect a defendant's "consciousness of guilt"); *see also King v. State*, 29 S.W.3d 556, 565 (Tex. Crim. App. 2000) (en banc) (recognizing that a defendant's attempts to cover up his crime by making false statements to police indicates a "consciousness of guilt" that may be considered in determining the defendant's guilt). In fact, as this Court has recognized, "[c]onciousness of guilt may be one of the strongest indicators of guilt." *Johnson v. State*, 234 S.W.3d 43, 55 (Tex. App.—El Paso 2007, no pet.) (citing *Lee v. State*, 866 S.W.2d 298, 302 (Tex. App.—Fort Worth 1993, pet. ref'd); *Torres v. State,* 794 S.W.2d 596, 598 (Tex. App.—Austin 1990, no pet.)). And, as in *Nisbett*, we find that the above-described factors indicated a "consciousness of guilt" from which the jury could have inferred that he harbored the requisite mental state necessary to commit Gaytan's murder.

As Marquez points out, however, there were some factors present in Delacruz's and Nisbett's cases upon which the court relied in finding sufficient evidence of their intent to murder their wives, which were absent in his case. In particular, Marquez points out that in both cases, the

---

[5] In addition, although not necessary to our analysis, we note that, like Delacruz, Marquez made statements—albeit somewhat cryptic in nature—to various individuals after Gaytan's disappearance that the jury could have found were incriminatory in nature, including his statement to a coworker that Gaytan's body would never be found. *Nisbett*, 552 S.W.3d at 268.

24

defendants' wives had expressed fear of their spouses to other people, and Nisbett had made statements suggesting his desire to murder his wife prior to her disappearance, while Delacruz had made statements on social media that could have been interpreted as threatening his wife prior to her disappearance. *Id.* at 267–68. But as the State points out, the court in *Nisbett* did not hold that such factors were dispositive or that the State was required to present evidence of such factors in every case as a threshold for finding adequate circumstantial evidence to support a defendant's murder conviction. To the contrary, the court in *Nisbett* clearly recognized that because every case will have its own unique set of facts, a court must carefully review the evidence presented in each case independently to determine if the "cumulative force of all the incriminating circumstances can support a murder conviction even if 'the evidence did not prove the method of commission of the offense.'" *Id.* at 264 (quoting *Ramos v. State*, 407 S.W.3d 265, 271 (Tex. Crim. App. 2013)). Accordingly, Marquez's piecemeal approach of parsing out each individual factor present in the *Nisbett* cases in comparing his case to theirs is contrary to the approach the Court of Criminal Appeals directs us to take. Here, we find the cumulative force of all the evidence in the record before us supports an inference that Marquez had the requisite mental state to commit Gaytan's murder.

### (5) The jury's verdict was not speculative.

Marquez argues the jury's verdict was based solely on speculation, rather than on facts and evidence, and that his conviction must therefore be reversed. *See Temple v. State*, 390 S.W.3d 341, 360 (Tex. Crim. App. 2013) (a "jury is not permitted to draw conclusions based on speculation because doing so is not sufficiently based on facts or evidence to support a finding beyond a reasonable doubt"). In making this argument, Marquez seeks to analogize his case to our sister court's holding in *Stobaugh v. State*, 421 S.W.3d 787 (Tex. App.—Fort Worth 2014, pet. ref'd),

25

in which the court overturned a defendant's murder conviction after finding the jury's verdict was based on improper speculation. This analogy fails, as Marquez is once again taking an improper piecemeal approach in comparing the factors present in his case to those present in *Stobaugh*.

Moreover, although there are similarities between *Stobaugh* and Marquez's case, there are also important distinctions. Similar to Marquez, the defendant in *Stobaugh* had the opportunity to murder his victim, as he was the last person seen with her and he had a motive to murder her given their troubled relationship. *Id.* at 862–63. In addition, as here, the defendant in *Stobaugh* provided false and/or inconsistent statements to the police after his wife's disappearance. *Id.* at 867. However, the court in *Stobaugh* found the existence of these factors insufficient to support a finding that the defendant engaged in any act that resulted in his wife's death, or that he had the requisite mens rea to murder her. *Id.* at 867. Instead, the court determined that the jury could have only found him guilty of murder "through theorizing or guessing" as to what the various factors meant, or in other words, through impermissible "speculation" that could not support a finding of guilt beyond a reasonable doubt. *Id.* at 861, 867. In making this determination, however, the court in *Stobaugh* found it significant that—in addition to there being no body, no murder weapon, and no witnesses—there was "no blood or DNA evidence; there [were] no fibers or hairs or any type of forensic evidence establishing that a murder occurred or linking [the defendant] to a murder; and there [was] no confession or directly incriminatory statement by [the defendant]." *Id.* at 865. The court also observed that none of the defendant's actions after his wife's disappearance were "probative of the mens rea element," and none of his "lies and inconsistent statements" were "on such topics or of such a nature that they are capable of supporting an inference of *mens rea* for murder." *Id.* at 866–67.

26

In contrast, as explained above, the record in Marquez's case contains evidence establishing not only that Marquez had the opportunity and the motive to murder Gaytan, but it also contains the type of forensic evidence missing in *Stobaugh*—specifically, the evidence that Gaytan's DNA was found on the rear cargo compartment of the Jeep that Marquez drove to the Red Sands desert area the day of her disappearance. This evidence not only linked Marquez to Gaytan's disappearance, but it also allowed the jury to reasonably infer that he placed Gaytan's body in the Jeep to dispose of it in the Red Sands area with the intent to conceal his crime, consistent with the State's theory. As well, the jury was presented with physical evidence that Marquez engaged in other activities in an attempt to conceal his crime, including evidence that he turned off the location feature on his cell phone the morning of Gaytan's disappearance. And in contrast with the inconsistent statements the defendant made to the police in *Stobaugh*, the inconsistent statements Marquez made to police regarding what occurred on the morning of Gaytan's disappearance were directly related to his efforts to conceal his crime. These factors are sufficient to distinguish Marquez's case from *Stobaugh* and provide assurance that the jury did not convict him based upon mere speculation. *See Carr v. State,* No. 03-14-00234-CR, 2016 WL 465192, at *6–7 (Tex. App.—Austin Feb. 5, 2016, pet. ref'd) (mem. op., not designated for publication) (distinguishing *Stobaugh*, where the record contained physical evidence linking the victim's death to the defendant, including evidence that the victim's body was found wrapped in a tent that was the same model as a tent bag found at the defendant's home, and cell phone records indicating that shortly after the victim's disappearance the defendant was driving in the area where the victim's body was later found).

In sum, although we recognize that no one factor present in Marquez's case would have necessarily supported the jury's finding that Marquez was guilty of Gaytan's murder, we do not—

as Marquez would have us do—view each factor in isolation in determining whether there was sufficient evidence to support his conviction. Instead, our charge is to determine whether the cumulative force of the circumstantial evidence, viewed in a light most favorable to the verdict, could have allowed a rational juror to infer beyond a reasonable doubt that Marquez was guilty of murdering Gaytan. *See Ingerson v. State*, 559 S.W.3d 501, 510–11 (Tex. Crim. App. 2018**)** (recognizing that although "each circumstance of guilt considered in isolation is insufficient to prove that [the defendant] murdered [his victims], when all of the evidence is viewed in the light most favorable to the verdict, and we consider the cumulative force of all the admitted evidence and reasonable inferences that can be drawn therefrom, we conclude that the evidence was sufficient to support the verdict"). For the reasons set forth above, we find the cumulative force of the evidence supports such an inference. Accordingly, we overrule Marquez's first issue.

## B. Prospective juror challenge for cause

In his second issue, Marquez argues the trial court abused its discretion when it denied his for-cause challenge to venireperson number 61 (VP61) on the ground that he was physically unfit to sit on the jury. Specifically, Marquez argues the trial court should have granted his challenge for cause because VP61 had "a defect in his eyesight that [rendered him] incapable of properly evaluating the evidence." We find no abuse of discretion in the record before us.

### (1) Background

During voir dire, VP61 initially informed the trial court that his "vision sometimes is not that great" and asked whether something could be done to ensure that he and the other jurors could clearly see any exhibits presented during trial. The judge responded that he would accommodate VP61's and the jurors' needs. In particular, the judge said he would ensure the exhibits were moved

28

closer to the jury box as needed.[6] The record does not indicate where VP61 was sitting when he first raised the concern about his ability to see the exhibits.

The prosecutor subsequently questioned VP61 in more detail about his vision issues. In response, VP61 explained that his "eyelid flips when [he] sleep[s] and stuff . . . so it makes [his] vision kind of blurry on this side" and sometimes he has allergies that affect his vision. The prosecutor then explained to VP61 that although exhibits could be moved closer, the witnesses on the stand could not. The prosecutor asked VP61 if he would have difficulty interpreting the witnesses' facial expressions. VP61 initially replied, "possibly," but when pressed for a yes or no answer, he responded, "yes." VP61 then stated he believed he would be comfortable seeing the witnesses' facial expressions from the front row. After apparently placing an individual on the witness stand, the court asked VP61 to stand in front of the jury box, and then asked him to "move closer" to the point where he was "comfortable" with seeing the individual and his facial expressions. VP61 then replied, "right here."

Defense counsel subsequently moved to strike VP61, arguing he "physically showed everybody he would have to be beyond the jury box to see the facial [tics] and facial expressions of the witnesses," and he was therefore "not physically capable of being a juror in this case." The prosecutor responded that he did not believe VP61 had an "impairment," asserting "we brought [him] all the way down here and [he] said that he was able to see the facial expression [sic]," adding that "if he had just been sitting there I could understand, but we brought him down here." The prosecutor, however, did not indicate the location to which VP61 had been "brought," nor did defense counsel attempt to identify the location.

---

[6] Initially, the parties agreed to strike VP61 from the panel, but for unexplained reasons, the State withdrew its agreement.

After the trial court denied Marquez's motion to strike VP61 for cause, defense counsel used his last preemptory challenge to remove VP61 from the panel. Defense counsel then asked the court for an additional peremptory challenge, but the trial court denied his request. Defense counsel thereafter noted for the record that he would have used the additional peremptory challenge to remove VP49 from the panel.

Following his conviction, Marquez filed a motion for new trial, arguing the trial court abused its discretion by refusing to strike VP61, contending VP61 "walked more than 6 feet in front of the [jury] box before telling the court that he could make out [facial] features."[7] During a hearing on his motion, defense counsel again asserted VP61 was "between six and seven feet from the jury when he was voir dired," and the judge replied, "[t]hat is what the court recalls." The State, however, argued the record reflected that VP61 could have been "accommodated" if he had been placed on the jury, as the parties "specifically discussed where he might have been [seated] so that he could observe the witnesses while they were on the stand." The prosecutor did not indicate where that seat would have been.

As set forth above, Marquez's motion for new trial was overruled by operation of law and the trial court made no findings of fact on the issue.

### (2) Applicable law and standard of review

Texas Code of Criminal Procedure Article 35.16(a)(5) governs when a venireperson's physical fitness precludes him from serving on a jury. It states:

> A challenge for cause may be made by either the state or the defense . . . [if] the juror has such defect in the organs of feeling or hearing, or such bodily or mental defect or disease as to render the juror unfit for jury service, or that the juror is legally blind and the court in its discretion is not satisfied that the juror is fit for jury service in that particular case[.]

---

[7] Defense counsel attached an affidavit to his motion in which he attested that "all of the allegations of fact contained therein are true and correct." He did not, however, provide an affidavit from VP61.

30

Tex. Code Crim. Proc. Ann. art. 35.16(a)(5). Having a physical defect of this nature, however, does not constitute an absolute disqualification. *Hicks v. State*, 606 S.W.3d 308, 316–17 (Tex. App.—Houston [1st Dist.] 2020, pet. ref'd) (recognizing that a prospective juror is only subject to absolute disqualification when he has been convicted of misdemeanor theft or a felony; he is under indictment or other accusation for misdemeanor theft or a felony; or he is "insane") (citing Tex. Code Crim. Proc. Ann. art. 35.19 (providing the three grounds for which a prospective juror may not be impaneled absent the parties' consent); *Vera v. State*, 496 S.W.3d 293, 295 (Tex. App.—San Antonio 2016, pet. ref'd) ("With the exception of three specific grounds for disqualification, the disqualification grounds listed in article 35.16 may be waived.")). Accordingly, as the parties agree, we may only reverse the trial court's denial of Marquez's challenge to VP61 based on his vision issues if the record, when viewed as a whole, demonstrates a clear abuse of discretion. [8] *See Davis v. State*, 329 S.W.3d 798, 807 (Tex. Crim. App. 2010). This is because the "trial judge is in the best position to evaluate a venire member's demeanor and responses." *Id.*

### (3) Analysis

Marquez's argument that the trial court abused its discretion in denying his for-cause challenge to VP61 centers on his contention that VP61 was standing almost seven feet from the jury box when he stated that he was able to comfortably view the "facial expressions" of the individual seated at the witness stand. According to Marquez, because of this, the trial court had

---

[8] If an appellant is able to establish that the trial court committed a clear abuse of discretion in denying his challenge to a venireperson for cause, the appellant must then establish that he was harmed by the denial, which requires a showing that: "(1) he asserted a clear and specific for cause challenge; (2) he used a peremptory challenge on the complained-of venire member; (3) his peremptory challenges were exhausted; (4) his request for additional strikes was denied; and (5) an objectionable juror sat on the jury." *See Comeaux v. State*, 445 S.W.3d 745, 749 (Tex. Crim. App. 2014) (citing *Davis v. State*, 329 S.W.3d 798, 807 (Tex. Crim. App. 2010)). Although Marquez contends he fulfilled all five requirements in seeking to challenge VP61 for cause, we do not reach the issue of harm, as we find no clear abuse of discretion in the trial court's decision to deny his for-cause challenge.

no choice but to find VP61 unfit to serve as a juror, as he would have been unable to view the witnesses' facial expressions from the jury box and consequently be unable to assess their credibility. *See generally Black v. Continental Casualty Co.*, 9 S.W.2d 743, 744 (Tex. Civ. App.—Austin 1928, no writ) (recognizing that "a juror whose vision or hearing is so defective that he cannot hear material testimony, or see the conduct of the witness on the stand, cannot as an impartial juror pass upon the credibility of the witness"). Although we do not discount the need for a juror to be able to assess the witnesses' credibility, the record before us does not support a finding that VP61 suffered from such a severe visual defect that, with a proper seating arrangement, he would not have been able to fulfill this duty as a juror.

When VP61 first expressed that he had vision issues and was concerned about being able to view exhibits, the trial court judge expressly stated he was willing to take any steps necessary to accommodate VP61's and the other jurors' needs at trial. And the record does not establish that the trial court lacked the means to accommodate VP61's visual issues.

The trial court was in the best position to evaluate the situation and make an implied determination that VP61's visual issues were not so severe that they rendered him unfit to serve on the jury if properly seated. *Davis,* 329 S.W.3d at 807 (recognizing that the trial court is in the best position to evaluate whether a venireperson is unfit for jury service). We find nothing in the record that would have required the trial court to find him unfit for service.

Finally, we note that Marquez has not cited any cases, nor are we aware of any, in which an appellate court has found that a trial court abused its discretion in denying a for-cause challenge to a venireperson under similar circumstances. Instead, the cases upon which Marquez relies all involve situations in which the trial courts were found to have properly granted for-cause challenges to jurors due to physical impairments that the jurors themselves believed rendered them

32

unfit for jury service. *See, e.g.*, *Villareal v. State*, 576 S.W.2d 51, 63 (Tex. Crim. App. 1978) (en banc) (trial court did not abuse its discretion in granting the State's challenge to prospective juror where she expressed doubt about her ability to serve on the jury, as she was suffering from various ailments that would interfere with her ability to sit through a long trial); *Hernandez v. State*, 643 S.W.2d 397, 401 (Tex. Crim. App. 1982) (en banc) (trial court did not abuse its discretion in sua sponte excusing a prospective juror who expressed doubts about his physical ability to serve due to illness); *Redd v. State*, 578 S.W.2d 129, 130 (Tex. Crim. App. [Panel Op.] 1979) (trial court did not abuse its discretion in sua sponte excusing a juror who stated that she had an inner ear problem that would keep her from attending court if it "acted up" during the trial). As the State points out, rather than helping Marquez's argument, these cases highlight the fact that a trial court has the discretion to determine whether a juror's physical defect or disease renders him unfit to serve as a juror.

Based on our review of the record, we conclude the trial court did not abuse its discretion in determining that VP61 was fit to serve on the jury and denying Marquez's for-cause challenge. Accordingly, we overrule Marquez's second issue.

### C.  Negative finding of sudden passion

In his third issue, Marquez argues the evidence was legally and factually insufficient to support the trial court's negative finding that his murder of Gaytan was due to sudden passion under Tex. Penal Code Ann. § 19.02(d). While simultaneously denying he killed Gaytan, Marquez explains that "during the punishment phase of trial he was faced with a guilty verdict and had no choice but to argue sudden passion." In other words, he posits, "so long as the jury was permitted to find facts which supported an intentional killing, then it behooved Marquez to argue that those same facts supported a finding by a preponderance of that same evidence that the killing was done

33

under the effects of sudden passion, especially when the State's own theory of the case was that Marquez snapped uncontrollably and by provocation." We find the evidence to be both legally and factually sufficient to support the trial court's negative finding.

### (1) Standard of review

As discussed, for elements of a criminal offense where the State bears the burden of proof beyond a reasonable doubt, we review sufficiency of the evidence under the *Jackson v. Virginia* standard. *Jackson*, 443 U.S. at 315–16; *Brooks*, 323 S.W.3d at 912. However, for matters in which the defendant bears the burden of proof by a preponderance of the evidence—such as the sudden-passion claim Marquez raised at punishment—we employ the civil standards of review for legal and factual sufficiency of the evidence. *See Rankin v. State*, 617 S.W.3d 169, 184–85 (Tex. App.—Houston [1st Dist.] 2020, pet. ref'd); *Gonzales v. State*, No. 11-17-00245-CR, 2019 WL 3727509, at *1–2 (Tex. App.—Eastland Aug. 8, 2019, pet. ref'd) (mem. op., not designated for publication); *see also Matlock v. State*, 392 S.W.3d 662, 671 (Tex. Crim. App. 2013) (recognizing that a factual-sufficiency review applies to issues where the burden of proof is by a preponderance of the evidence because that standard is the same used in various civil proceedings); *Rogers*, 2023 WL 3736730, at *3.

As applied to a sudden-passion claim, we review the evidence for legal sufficiency by examining the record for any evidence that supports the fact-finder's findings while ignoring all evidence to the contrary unless a fact-finder could not. *Matlock*, 392 S.W.3d at 669; *Rogers*, 2023 WL 3736730, at *3. If no evidence supports the finding, we review the entire record to determine whether the evidence establishes the opposite as a matter of law. *Matlock*, 392 S.W.3d at 668; *Rogers*, 2023 WL 3736730, at *3.

34

We review the evidence for factual sufficiency to support the finding by examining all of the evidence in a neutral light to determine whether the verdict is "so against the great weight and preponderance of that evidence to be manifestly unjust." *Matlock*, 392 S.W.3d at 672–73 (citation omitted); *Rogers*, 2023 WL 3736730, at *3; *see also Meraz v. State*, 785 S.W.2d 146, 154–55 (Tex. Crim. App. 1990) (en banc) (setting forth this standard). We may only sustain a factual-sufficiency challenge "if, after setting out the relevant evidence and explaining precisely how the contrary evidence greatly outweighs the evidence supporting the verdict, the court clearly states why the verdict is so much against the great weight of the evidence as to be manifestly unjust, conscience shocking, or clearly biased." *Matlock*, 392 S.W.3d at 671; *Rogers*, 2023 WL 3736730, at *3.

In reviewing both legal and factual sufficiency of the evidence, we must defer to the fact-finder's role as sole judge of the weight and credibility of the evidence and recognize that the fact-finder is free to accept or reject a defendant's version of the events supporting his sudden-passion claim. *See Rankin*, 617 S.W.3d at 185; *Rogers*, 2023 WL 3736730, at *3.

### (2) Applicable law

Murder is normally a felony offense of the first degree. Tex. Penal Code Ann. § 19.02(c). However, § 19.02(d) of the Texas Penal Code allows a defendant to raise the issue of sudden passion in the punishment phase of a trial for murder to attempt to reduce the degree of the offense. In particular, § 19.02(d) provides:

> At the punishment stage of a trial, the defendant may raise the issue as to whether he caused the death under the immediate influence of sudden passion arising from an adequate cause. If the defendant proves the issue in the affirmative by a preponderance of the evidence, the offense is a felony of the second degree.

"Adequate cause" is defined to mean a "cause that would commonly produce a degree of anger, rage, resentment, or terror in a person of ordinary temper, sufficient to render the mind incapable

of cool reflection." *Id.* § 19.02(a)(1). "Sudden passion" means "passion directly caused by and arising out of provocation by the individual killed or another acting with the person killed which passion arises at the time of the offense and is not solely the result of former provocation." *Id.* § 19.02(a)(2). The defendant has the burden of production and persuasion to prove sudden passion. *Wooten v. State*, 400 S.W.3d 601, 605 (Tex. Crim. App. 2013).

### (3) Analysis

#### (a) The evidence is legally sufficient to support the trial court's negative finding.

Marquez argues the evidence presented by the State during the guilt/innocence phase of trial that he was jealous, became enraged when Gaytan rejected him, and just "snapped" provided evidence to support a finding that he killed Gaytan in sudden passion. Marquez's argument during the punishment phase mirrored the State's argument when he claimed that he "acted out of anger, rage, and resentment caused by [Gaytan]'s repeated flat-out rejection" of him, and that he "snapped" and "killed her as the State says because she rejected him over and over and over again . . . ." As Marquez argues on appeal,

> [t]he evidence in the record reflects that [he] had insisted and asked Gaytan several times that they be in a more serious relationship. That on the evening of July 13, 2019, she had been very affectionate with him, leading him to believe she was going to say yes. On the way to his house, Marquez insisted that Gaytan be his girlfriend and tells her to say yes. The conversation continued after the arrival at his house. Gaytan then told him she was not going to be his girlfriend.

Marquez also mentions that even "[d]uring the punishment phase, the State paraded three witnesses through the witness box for no other reason than to establish that [he] was a jealous, angry person generally."

The record does reflect that Marquez was both jealous and possessive of Gaytan. There is also evidence that Gaytan had rejected his multiple requests that the two be boyfriend and

36

girlfriend, including a request that right before her death. However, we cannot find that Marquez's emotional response to Gaytan's rejection constitutes an "adequate cause" giving rise to sudden passion. The sudden passion claim is reserved for those circumstances in which the cause would "commonly produce a degree of anger, rage, or resentment . . . in a person of ordinary temper, sufficient to render the mind incapable of cool reflection." Tex. Penal Code Ann. § 19.02(a)(1). The claim is not available in the case of someone "whose actual emotional responses are aberrational in this society." *Lopez v. State*, 716 S.W.2d 127, 129 (Tex. App.—El Paso 1986, pet. ref'd).[9] Indeed, this Court held almost 40 years ago that anger resulting from a rejection of a romantic proposal does not qualify as adequate cause for purposes of the sudden-passion defense. *See Hill v. State*, 679 S.W.2d 173, 175 (Tex. App.—El Paso 1984, no pet.) ("The jury could legitimately conclude that Appellant's entire depiction of the relationship was false, that he killed her as a spurned lover and that her rejection did not amount to adequate cause."). [10]

Today, we similarly find that the anger, rage, or resentment arising from the rejection of a romantic proposal, without more, does not constitute an adequate cause giving rise to sudden

---

[9] The *Lopez* court was operating under the prior voluntary manslaughter framework explained in footnote 9. *Lopez v. State*, 716 S.W.2d 127, 129 (Tex. App.—El Paso 1986, pet. ref'd).

[10] *Hill* was decided prior to September 1, 1994, when the "whether a defendant committed murder under the immediate influence of sudden passion arising from an adequate cause was an issue that was litigated at the guilt phase of the trial." *See Wooten v. State*, 400 S.W.3d 601, 604–05 (Tex. Crim. App. 2013) (explaining the history of the sudden passion affirmative defense). In *Wooten* the Court of Criminal Appeals explained the development of the sudden passion defense in 1994:

> If the evidence raised the issue of sudden passion, the question was submitted to the jury, and it had the option of finding the defendant guilty of the lesser offense of voluntary manslaughter. Because of certain anomalies generated by this framework, the Legislature acted in 1993 to remove the crime of voluntary manslaughter from the Texas Penal Code. Under the current statutory scheme, the question of whether a defendant killed while under the immediate influence of sudden passion is a punishment issue.

*Id.* (internal footnotes omitted) Importantly, however, the definition of what constitutes "adequate cause" for purposes of the sudden passion defense has not changed since *Hill* was decided. *See Hill v. State*, 679 S.W.2d 173, 174 (Tex. App.—El Paso 1984, no pet.) (citing *Hobson v. State*, 644 S.W.2d 473, 478 (Tex. Crim. App. 1983)) ("Viewing the alleged provocation objectively—through the eyes of an ordinary man—we do not find there is enough evidence of adequate cause, sufficient to render the mind of a person of ordinary temper incapable of cool reflection . . . .").

passion. In other words, we cannot conclude that Gaytan rejecting Marquez's repeated requests and insistence that he and she be boyfriend and girlfriend would "commonly produce a degree of anger, rage, or resentment in a person of ordinary temper, sufficient to render the mind incapable of cool reflection." Tex. Penal Code Ann. § 19.02(a)(1). To hold otherwise would impliedly normalize the inability to cool down and reflect following such a romantic rejection.

Moreover, we agree with the State that, as opposed to Marquez's suggestion that Gaytan provoked him by rejecting him, "the trial court could have reasonably found that Marquez, who badgered [Gaytan] and refused to take 'no' for an answer, created the circumstances that allegedly inflamed his passions, such that he cannot claim that his conduct arose from adequate cause."[11]

For these reasons, the trial court could have found that adequate cause giving rise to sudden passion did not exist. We therefore conclude that legally sufficient evidence supports the trial court's negative finding of sudden passion.

### (b) The evidence is factually sufficient to support the trial court's negative finding.

Regarding Marquez's factual sufficiency challenge, "we review all the evidence in a neutral light to determine if the contrary evidence greatly outweighs the evidence that supports the [trial court]'s determination." *Rogers*, 2023 WL 3736730, at *5 (citing *Gonzales*, 2019 WL 3727509 at *3). Marquez did not testify during either phase of the trial. Other than evidence of his jealousy and possessiveness toward Gaytan and her rejection of his romantic proposals, the record contains no other direct evidence of his state of mind when he killed Gaytan. On appeal, Marquez reiterates his punishment-phase position that, according to the State, he killed Gaytan when he

---

[11] In support of this point, the State cites *De Leon v. State*, 373 S.W.3d 644, 650 (Tex. App.—San Antonio 2012, pet. ref'd) and *Naasz v. State*, 974 S.W.2d 418, 425 (Tex. App.—Dallas 1998, pet. ref'd) (holding that the defendant could not claim his conduct arose from an adequate cause where he provoked the incident that allegedly inflamed his passions).

snapped because of her multiple rejections of him, and he calls our attention to evidence indicating that he is not ordinarily given to rage.

Viewing all of the evidence in a neutral light, Marquez's assertion that his emotional response to Gaytan's rejection constituted adequate cause giving rise to sudden passion must fail for the same reasons enumerated above. The trial court was free to reject his assertion that, based on the facts, he was so emotionally overwhelmed by Gaytan's rejection of him that he was incapable of cool reflection, thus justifying the trial court's finding that Marquez's actions were not supported by adequate cause giving rise to sudden passion. Giving appropriate deference to the trial court's role as fact-finder during the punishment phase of trial, its negative sudden-passion finding is not so "against the great weight of the evidence as to be manifestly unjust, conscience-shocking, or clearly biased." *See Matlock*, 392 S.W.3d at 671; *Rogers*, 2023 WL 3736730, at *6. Consequently, we conclude that factually sufficient evidence supports the trial court's negative finding of sudden passion.

Because we find legally and factually sufficient evidence supports the trial court's negative finding of sudden passion, we overrule Marquez's third issue.

### III. CONCLUSION

We affirm the trial court's judgment of conviction.

LISA J. SOTO, Justice

August 30, 2024

Before Alley, C.J., Palafox and Soto, JJ.

39